**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| Ravgen, Inc., | |
| Plaintiff, | Civil Action No._____ |
| v. | **JURY TRIAL DEMANDED** |
| Illumina, Inc. and Verinata Health, Inc., | |
| Defendants. | |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Ravgen, Inc. ("Ravgen"), for its Complaint against Defendants Illumina, Inc. ("Illumina") and Verinata Health, Inc. ("VHI") (collectively "Defendants"), hereby alleges as follows:

**NATURE OF THE ACTION**

1.     This is a civil action for infringement of United States Patent Nos. 7,727,720 (the "'720 Patent") and 7,332,277 (the "'277 Patent") (collectively the "Patents-in-Suit"), arising under the Patent Laws of the United States, 35 U.S.C. §§ 271 *et seq*.

**THE PARTIES**

2.     Plaintiff Ravgen is a Delaware corporation with its principal place of business at 9241 Rumsey Rd., Columbia, MD 21045.  Ravgen is a pioneering diagnostics company that focuses on non-invasive prenatal testing.  Ravgen has spent millions of dollars researching and developing novel methods for the detection of cell-free DNA to replace conventional, invasive procedures.  Ravgen's innovative cell-free DNA technology has various applications, including non-invasive prenatal and other genetic testing.  Those efforts have resulted in the issuance of several patents, including the Patents-in-Suit.

3.      Defendant Illumina is a company organized and existing under the laws of the State of Delaware, with its principal place of business at 5200 Illumina Way, San Diego, California, 92122.  (Ex. 5 at 1 (Illumina Inc. Form 10-Q, September 27, 2020).)  Illumina has appointed The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801 as its agent for service of process.  (Ex. 6 (State of Delaware Entity Status for Illumina Inc.).)

4.      Defendant VHI is a company organized and existing under the laws of the state of Delaware, with its principal place of business at 5200 Illumina Way, San Diego, California 92122. VHI has appointed The Corporation Trust Company, Corporation Trust Center 1209 Orange Street, Wilmington, Delaware 19801 as its agent for service of process.  (Ex. 7 (State of Delaware Entity Status for Verinata Health, Inc.).)  VHI is a wholly owned subsidiary of Illumina.  (*See*, *e.g.*, Ex 8 at 116 (Illumina Inc. Form 10-K, 2019).)

5.      Defendants, themselves and/or through their subsidiaries and affiliates, make, use, and commercialize noninvasive prenatal tests that utilize next-generation sequencing (NGS) of circulating cell-free DNA (cfDNA) extracted from a maternal blood sample to screen for aneuploidy of chromosomes marketed under the tradename "Verifi."

6.      Defendants, themselves and/or through their subsidiaries and affiliates, make, use, and commercialize genetic tests using cell-free DNA, including in vitro diagnostic tests intended for use as sequencing-based screening tests for the detection of fetal aneuploidies from maternal peripheral whole blood samples in pregnant women of at least 10 weeks gestation marketed under the tradename "VeriSeq."

7.      Defendants, themselves and/or through their subsidiaries and affiliates, make, use, and commercialize genetic tests using cell-free DNA, including tests intended for use as

sequencing-based screening tests for the detection of somatic variations, including tumor mutational burden and microsatellite instability, from peripheral whole blood samples under the tradename "TruSight."

8.      Defendants offer and market tests under the Verifi, VeriSeq, and TruSight tradenames throughout the United States, including without limitation through the website, www.illumina.com.                    (*See              generally*              Ex.               9 (https://www.illumina.com/clinical/illumina_clinical_laboratory/verifi-prenatal-tests.html);   Ex. 10    (https://www.illumina.com/products/by-type/ivd-products/veriseq-nipt.html);    Ex.    11 (https://www.illumina.com/products/trusight-panels.html).)

## JURISDICTION AND VENUE

9.      Ravgen incorporates by reference paragraphs 1–8.

10.     This action arises under the patent laws of the United States, including 35 U.S.C. §§ 271 *et seq.*  The jurisdiction of this Court over the subject matter of this action is proper under 28 U.S.C. §§ 1331 and 1338(a).

11.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b), (c), and 1400(b). Defendants are entities organized under the laws of Delaware and reside in Delaware for purposes of venue under 28 U.S.C. § 1400(b).  Defendants conduct business in Delaware, at least by offering for sale and selling products and services through their websites, which are accessible in Delaware. Defendants have also committed and continue to commit acts of infringement in this District.

12.     This Court has personal jurisdiction over Defendants because Defendants conduct business in Delaware by at least offering for sale or selling products and services through their websites, which are accessible in Delaware, and because infringement has occurred and continues to occur in Delaware.

13.     Personal jurisdiction also exists over Defendants because they are entities organized under the laws of Delaware.

## BACKGROUND OF THE INVENTION

14.     Dr. Ravinder S. Dhallan is the founder of Ravgen, Inc. and the inventor of several patents in the field of detection of genetic disorders, including chromosomal abnormalities and mutations.  Ravgen's mission is to provide state of the art genetic testing that will enrich the lives of its patients.  For example, through the use of its novel techniques in non-invasive prenatal diagnostic testing, Ravgen gives patients the knowledge they need to prepare for their pregnancies and treat diseases at an early stage.

15.     Prior to founding Ravgen, Dr. Dhallan was a board-certified emergency room physician.  Between starting medical school at Johns Hopkins University and shortly after his residency at Mass General (Harvard University School of Medicine), Dr. Dhallan and his wife suffered three miscarriages.  At that time, the prenatal diagnostic testing procedures available included (a) non-invasive techniques with low sensitivity and specificity, and (b) tests with higher sensitivity and specificity that were highly invasive and therefore associated with a risk for loss of pregnancy.  After discovering the limitations on the available techniques for prenatal testing, Dr. Dhallan made it his mission to invent an improved prenatal diagnostic exam—one that was both non-invasive and accurate.  In September of 2000, Dr. Dhallan founded Ravgen (which stands for "Rapid Analysis of Variations in the GENome") to pursue that goal.

16.     Prior to Ravgen's inventions, scientists had recognized the need for a genetic testing technique that used "cell-free" or "free" fetal DNA circulating in maternal blood.  A technique that relied on circulating free fetal DNA would require only a simple blood draw from the mother and would therefore be an improvement over invasive diagnostic tests.

4

17.     However, at that time, the use of free fetal DNA for detecting chromosomal abnormalities was limited by the low percentage of free fetal DNA that could be recovered from a sample of maternal blood using existing techniques.  (*See*, *e.g.*, Ex. 12 (Y.M. Dennis Lo et al., *Presence of Fetal DNA in Maternal Plasma and Serum*, 350 THE LANCET 768-75 (1997), https://doi.org/10.1016/S0140-6736(97)02174-0).)   Dr. Dhallan recognized that a method that could increase the percentage of free fetal DNA relative to the free maternal DNA in a sample was necessary to the development of an accurate, non-invasive prenatal diagnostic test.

18.     After substantial research, Dr. Dhallan conceived that including an agent that impedes cell lysis (disruption of the cell membrane) if cells are present during sample collection, shipping, handling, and processing would permit the recovery of a larger percentage of cell-free fetal DNA (relative to the cell-free maternal DNA in a sample).  Dr. Dhallan hypothesized that this new approach would decrease the amount of maternal cell lysis and therefore lower the amount of cell-free maternal DNA in the sample, thereby increasing the percentage of cell-free fetal DNA. He developed a novel method for processing cell-free fetal DNA that involved the addition of an agent that impedes cell lysis—for example, a membrane stabilizer, a cross-linker, and/or a cell lysis inhibitor—to maternal blood samples coupled with careful processing protocols.  With that novel method, Dr. Dhallan was able to increase the relative percentage of cell-free fetal DNA in the processed sample.

19.     Having successfully increased the relative percentage of cell-free fetal DNA recovered, Dr. Dhallan next addressed the challenge of distinguishing between the cell-free maternal and cell-free fetal DNA in a sample in order to determine whether a chromosomal abnormality is present in the fetal DNA.  Prior to Ravgen's inventions, known methods for detecting fetal chromosomal abnormalities were time-consuming and burdensome.  Many required

amplification of the entire sequence of a gene, or quantification of the total amount of a particular gene product in a sample.  Dr. Dhallan developed an alternate method that greatly increased the efficiency of this process by taking advantage of the variation of base sequences among different individuals (including a mother and fetus) ("alleles") at particular positions ("loci") on chromosomes.  The term "allele" refers to an alternate form of a gene, or a non-coding region of DNA that occurs at a particular locus on a chromosome.  The alleles present at certain loci on chromosomes (including, for example, "single nucleotide polymorphisms" or "SNPs") vary between different individuals.  At such a locus, a fetus may therefore inherit an allele from its father that differs from the alleles present at that locus on its mother's chromosome.  Dr. Dhallan developed a novel method for quantifying the allelic ratio at such a locus (or loci) of interest in a sample comprising maternal and fetal cell-free DNA in order to detect whether a fetal chromosomal abnormality was present in the fetal DNA of the sample, without requiring physical separation of the fetal from the maternal cell-free DNA.

20.    Dr. Dhallan understood that his breakthroughs laid the foundation for the development of accurate non-invasive prenatal diagnostic tests.  For example, he published a paper in the *Journal of the American Medical Association* (*JAMA*) in 2004, explaining that "the methods described herein for increasing the percentage of cell-free fetal DNA provide a solid foundation for the development of a noninvasive prenatal diagnostic test."  (Ex. 13 at 1119 (R. Dhallan et al., *Methods to Increase the Percentage of Free Fetal DNA Recovered from the Maternal Circulation*, 291 JAMA 1114–19 (2004), https://doi.org/10.1001/jama.291.9.1114).)

21.    *JAMA* also ran an editorial alongside Dr. Dhallan's article in 2004, recognizing the significance of his inventions to applications in prenatal genetic diagnosis and cancer detection and surveillance:

> In this issue of THE JOURNAL, the findings reported in the study by Dhallan and colleagues on enhancing recovery of cell-free DNA in maternal blood have major clinical implications. Developing a reliable, transportable technology for cell-free DNA analysis impacts 2 crucial areas—prenatal genetic diagnosis and cancer detection and surveillance. In prenatal genetic diagnosis, detecting a fetal abnormality without an invasive procedure (or with fewer invasive procedures) is a major advantage. Likewise in cancer surveillance (eg, in patients with leukemia), monitoring treatment without having to perform a bone marrow aspiration for karyotype also would be of great benefit.
>
>                 \* \* \*
>
> With prospective studies focusing on clinical applications of these findings, profound clinical implications could emerge for prenatal diagnosis and cancer surveillance.

(Ex. 14 at 1135, 1137 (J.L. Simpson & F. Bischoff, *Cell-Free Fetal DNA in Maternal Blood: Evolving Clinical Applications*, 291 JAMA 1135–37 (2004), https://doi.org/10.1001/jama.291.9.1135).)

22.     In 2007, Dr. Dhallan published a second journal article in *The Lancet* that presented a study showcasing Ravgen's ability to use its novel technology to detect Down's syndrome using free fetal DNA in a maternal blood sample.  (Ex. 15 (R. Dhallan et al., *A Non-Invasive Test for Prenatal Diagnosis Based on Fetal DNA Present in Maternal Blood: A Preliminary Study*, 369 THE LANCET 474–81 (2007), https://doi.org/10.1016/S0140-6736(07)60115-9).)  Dr. Dhallan's peers at *The Lancet* also recognized that his innovative test "opens a new era in prenatal screening." (*See* Ex. 16 (A. Benachi & J.M. Costa, *Non-Invasive Prenatal Diagnosis of Fetal Aneuploidies*, 369 THE LANCET 440–42 (2007), https://doi.org/10.1016/S0140-6736(07)60116-0).)

23.     Dr. Dhallan's publications received worldwide press coverage, from outlets such as CNN, BBC, and Washington Post.  (*See* Ex. 17 (L. Palmer, *A Better Prenatal Test?*, CNN MONEY (Sept. 12, 2007), https://money.cnn.com/2007/09/07/smbusiness/amniocentesis .fsb/index.htm); Ex. 18 (*Hope for Safe Prenatal Gene Test*, BBC NEWS, Feb 2, 2007,

http://news.bbc.co.uk/2/hi/health/6320273.stm); Ex. 19 (A. Gardner, *Experimental Prenatal Test Helps Spot Birth Defects*, WASH. POST (Feb. 2, 2007), https://www.washingtonpost.com/wp-dyn/content/article/2007/02/02/AR2007020200914.html).)

24.     The Patents-in-Suit resulted from Dr. Dhallan's years-long research at Ravgen to develop these innovative new methods for detecting genetic disorders.

## **PATENTS-IN-SUIT**

25.     Ravgen incorporates by reference paragraphs 1–24.

26.     The '277 Patent, entitled "Methods For Detection Of Genetic Disorders," was duly and legally issued by the United States Patent and Trademark Office on February 19, 2008.  The inventor of the patent is Ravinder S. Dhallan, and the patent is assigned to Ravgen.  A copy of the '277 Patent is attached hereto as Exhibit 1.

27.     Ravgen is the exclusive owner of all rights, title, and interest in the '277 Patent, and has the right to bring this suit to recover damages for any current or past infringement of the '277 Patent.  (*See* Ex. 3.)

28.     The '720 Patent, entitled "Methods For Detection Of Genetic Disorders," was duly and legally issued by the United States Patent and Trademark Office on June 1, 2010.  The inventor of the patent is Ravinder S. Dhallan, and the patent is assigned to Ravgen.  A copy of the '720 Patent is attached hereto as Exhibit 2.

29.     Ravgen is the exclusive owner of all rights, title, and interest in the '720 Patent, and has the right to bring this suit to recover damages for any current or past infringement of the '720 Patent.  (*See* Ex. 4.)

30.     The '277 Patent is directed to, among other things, novel methods used in the detection of genetic disorders.  For example, claim 81 of the '277 Patent recites:

> A method for preparing a sample for analysis comprising isolating free fetal nucleic acid from a the sample, wherein said sample comprises an agent that inhibits lysis of cells, if cells are present, and wherein said agent is selected from the group consisting of membrane stabilizer, cross-linker, and cell lysis inhibitor.

31.    The '720 Patent is directed to novel methods for detecting a free nucleic acid in a sample.  For example, claim 1 of the '720 Patent recites:

> A method for detecting a free nucleic acid, wherein said method comprises: (a) isolating free nucleic acid from a non-cellular fraction of a sample, wherein said sample comprises an agent that impedes cell lysis, if cells are present, and wherein said agent is selected from the group consisting of membrane stabilizer, cross-linker, and cell lysis inhibitor; and (b) detecting the presence or absence of the free nucleic acid.

32.    The Patents-in-Suit are directed to unconventional, non-routine techniques for preparing and analyzing extracellular circulatory DNA, including for the detection of genetic disorders.  The Patents-in-Suit explain that, *inter alia*, the inventions claimed therein overcame problems in the field—for example, that the low percentage of fetal DNA in maternal plasma makes using the DNA for genotyping the fetus difficult—with a novel and innovative solution— the addition of cell lysis inhibitors, cell membrane stabilizers or cross-linkers to the maternal blood sample, which increase the percentage of cell-free DNA available for detection and analysis:

> The percentage of fetal DNA in maternal plasma is between 0.39-11.9% (Pertl, and Bianchi, *Obstetrics and Gynecology* 98: 483-490 (2001)). **The majority of the DNA in the plasma sample is maternal, which makes using the DNA for genotyping the fetus difficult**. However, methods that increase the percentage of fetal DNA in the maternal plasma allow the sequence of the fetal DNA to be determined, and allow for the detection of genetic disorders including mutations, insertions, deletions, and chromosomal abnormalities. **The addition of cell lysis inhibitors, cell membrane stabilizers or cross-linkers to the maternal blood sample can increase the relative percentage of fetal DNA.** While lysis of both maternal and fetal cells is inhibited, the vast majority of cells are maternal, and thus by reducing the lysis of maternal cells, there is a relative increase in the percentage of free fetal DNA.

(Ex. 1 ('277 Patent) at 32:24–39; Ex. 2 ('720 Patent) at 33:31–46 (emphases added).)

33.    The Patents-in-Suit teach that the benefit of Dr. Dhallan's discovery, an increase in the relative percentage of cell-free DNA, is realized by performance of the claimed method, including through the inclusion of an agent that inhibits the lysis of the cells in a sample:

> An overall increase in fetal DNA was achieved by reducing the maternal cell lysis, and thus, reducing the amount of maternal DNA present in the sample.  In this example, formaldehyde was used to prevent lysis of the cells, however any agent that prevents the lysis of cells or increases the structural integrity of the cells can be used. Two or more than two cell lysis inhibitors can be used.  The increase in fetal DNA in the maternal plasma allows the sequence of the fetal DNA to be determined, and provides for the rapid detection of abnormal DNA sequences or chromosomal abnormalities including but not limited to point mutation, reading frame shift, transition, transversion, addition, insertion, deletion, addition-deletion, frame-shift, missense, reverse mutation, and microsatellite alteration, trisomy, monosomy, other aneuploidies, amplification, rearrangement, translocation, transversion, deletion, addition, amplification, fragment, translocation, and rearrangement.

(Ex. 1 ('277 Patent) at 91:44–60; Ex. 2 ('720 Patent) at 92:10–26.)

34.    For example, during the prosecution of the '720 Patent at the Patent and Trademark Office, Ravgen explained that the innovative concept of using agents that inhibit cell lysis during cell-free DNA detection and analysis is recited by the claimed methods of the '720 Patent, including in claim 1:

> Applicant has discovered that the addition of a cell lysis inhibitor to a sample prior to detecting the presence of free nucleic acid can ***significantly and unexpectedly*** increase the proportion of free nucleic acid obtained from the non-cellular fraction of a sample.
>
> * * *
>
> The methods disclosed in claims 1-8, 21-23, and 26 serve a long-felt need in the medical community, and provide unexpected results, and are therefore non-obvious.

(Ex. 20 ('720 File History, June 2, 2009 Response to Office Action) at 12, 14 (emphasis added).)

10

35.     The inventive concept of the Patents-in-Suit of including an agent that inhibits cell lysis—for example, a membrane stabilizer, a cross-linker, and/or a cell lysis inhibitor—with a sample represented a significant improvement in the preparation of samples used for non-invasive testing, including non-invasive prenatal testing to unmask previously undetectable fetal genetic traits.  At the time of the invention, it would not have been routine or conventional to add an agent that inhibits cell lysis to a sample to increase the proportion of free nucleic acid obtained from the non-cellular fraction of a sample.   In fact, as described above, that inventive concept was recognized by Dr. Dhallan's peers as "an important step in improving detection of cell-free DNA." (Ex. 14 at 1137.)

36.     The '277 Patent is further directed to an unconventional, non-routine method of detecting fetal chromosomal abnormalities which involves "quantitating a ratio of the relative amount of alleles in a mixture of maternal DNA and fetal DNA."  (Ex. 21 ('277 File History, May 30, 2007 Response to Office Action) at 30.)  For example, claim 1 of the '277 Patent recites:

> A method for detecting the presence or absence of a fetal chromosomal abnormality, said method comprising: quantitating a ratio of the relative amounts of alleles at a heterozygous locus of interest in a mixture of template DNA, wherein said mixture comprises maternal DNA and fetal DNA, and wherein said mixture of maternal DNA and fetal DNA has been obtained from a sample from a pregnant female, and further wherein said heterozygous locus of interest has been identified by determining the sequence of alleles at the locus of interest, and wherein said ratio indicates the presence or absence of a fetal chromosomal abnormality.

37.     The '277 Patent explains that this claimed method represented a significant improvement over prior art methods of detecting fetal chromosomal abnormalities, many of which were costly, time-consuming, and burdensome because they either required the amplification of the entire sequence of a gene, or quantification of the total amount of a particular gene product. (Ex. 1 at 66:14-20.)  By contrast, the claimed "ratio" method of the '277 Patent only requires

sequencing of discrete "loci of interest" (such as "single nucleotide polymorphisms," or "SNPs") from the collected DNA sample.  (*Id.* at 34:63-35:37 ("In fact, it is an advantage of the invention that primers that copy an entire gene sequence need not be utilized. . . . There is no advantage to sequencing the entire gene as this can increase cost and delay results.  Sequencing only the desired bases or loci of interest maximizes the overall efficiency of the method because it allows for the sequence of the maximum number of loci of interest to be determined in the fastest amount of time and with minimal cost."); *Id.* at 35:28-37.)

38.     During the prosecution of the '277 Patent at the Patent and Trademark Office, Ravgen gave the following example of an implementation of the claimed "ratio" method:

> Applicants have invented a method for detecting the presence or absence of a fetal chromosomal abnormality, wherein the method comprises, inter alia, quantitating a ratio of the relative amount of alleles in a mixture of maternal DNA and fetal DNA.
>
> ***
>
> [R]atios were calculated at both chromosomes 13 and 21 in a heterogeneous mixture of 75% Down syndrome DNA and 25% maternal DNA.  Single nucleotide polymorphisms were analyzed wherein the maternal genome was homozygous for one allele at a specific genetic site and the Down syndrome DNA was heterozygous at the same genetic site.  If at a certain site, the maternal genome contains an adenine at both copies of chromosome 13, and the Down syndrome genome is comprised of one chromosome with an adenine nucleotide and one chromosome with a guanine nucleotide, then the ratio of G:A is 0.60 (0.75 (Down syndrome G allele)/(0.75 Down syndrome A allele + 0.25 + 0.25 maternal A alleles).
>
> On the other hand, if at a certain genetic site on chromosome 21, the maternal genome contains an adenine at both copies of chromosome 21, and the Down syndrome genome is comprised of two chromosome with an adenine nucleotide and one chromosome with a guanine nucleotide, then the ratio of G:A is 0.375 (0.75 (Down syndrome G allele)/(0.75 Down syndrome A allele + 0.75 Down syndrome A allele + 0.25 + 0.25 (maternal A alleles).  Thus, the methods described in the present application detect chromosomal

> abnormalities using a method that comprises, inter alia, quantitating
> a ratio of alleles in a heterogeneous mixture of DNA, wherein the
> ratio represents alleles from more than one individual.

(Ex. 21 ('277 File History, May 30, 2007 Response to Office Action) at 30.)

## DEFENDANTS' INFRINGING ACTIVITIES

39.     Ravgen incorporates by reference paragraphs 1–38.

## A.     The Accused Verifi Prenatal Tests

40.     On March 6, 2012, VHI launched the Verifi® Prenatal Test, a commercial non-invasive prenatal test for detecting fetal chromosomal abnormalities.   (*See* Ex. 22 (https://www.medgadget.com/2012/03/verinata-launches-prenatal-to-test-to-detect-down-syndrome.html).)   On January 7, 2013, Illumina announced that it was acquiring VHI for access to VHI's Verifi® Prenatal Test, and that the Verifi® Prenatal Test would continue to be offered through VHI's CLIA-certified and CAP-accredited laboratory.   (Ex. 23 (https://investor.illumina.com/news/press-release-details/2013/Illumina-Strengthens-Leadership-Position-in-Reproductive-Health-withAgreement-to-Acquire-Verinata-Health-Inc/default.aspx).) In 2017, Defendants began providing the Verifi® Plus Prenatal Test.  (*See* Ex. 24 (*Illumina, Inc. v. Natera, Inc.*, Case No. 3:18-cv-01662-SI, D.I. 63 at 5 (N.D. Cal. Sep. 6, 2018)).)  The Verifi® Plus Prenatal Test contains everything in the Verifi® Prenatal Test and includes additional panels. (Ex. 9 (https://www.illumina.com/clinical/illumina_clinical_laboratory/verifi-prenatal-tests.html).)  Defendants now offer both the Verifi® Prenatal Test and Verifi® Plus Prenatal Test (collectively the "Verifi Tests").  (*Id.*)

41.     The Verifi Tests offer "noninvasive prenatal testing (NIPT) based on cell-free DNA analysis from a maternal blood draw."   (Ex. 9 (https://www.illumina.com/clinical/illumina_clinical_laboratory/verifi-prenatal-tests.html).)

42. The Verifi Tests require samples containing an agent that inhibits cell lysis. For example, providers of the Verifi Tests list "One Streck BCT tube" or "Streck Cell-Free DNA BCT" as the container for the test specimen requirements. (*See*, *e.g.*, Ex. 25 (https://nslijlab.testcatalog.org/show/VERIFI); Ex. 26 at 2 (https://www.ntd-eurofins.com/healthcare-providers/screening-options-overview/prenatal-screening/non-invasive-prenatal-screening/:http://www.ntd-eurofins.com/wp-content/uploads/2018/12/Verifi-Sample-Collection-and-Shipping-Instructions_LB-0010.pdf ); Ex. 27 (http://www.viapath.co.uk/news-and-press/leading-non-invasive-prenatal-test-now-available-through-viapath).)

43. Illumina-funded scientific articles analyzing the Verifi Tests confirm the use of Streck Blood Collection Tubes (BCT™) tubes to collect samples for the Verifi Tests. (*See*, *e.g.*, Ex. 28 at 376 (Diana W. Bianchi, *et al.*, *Fetal Sex Chromosome Testing by Maternal Plasma DNA Sequencing: Clinical Laboratory Experience and Biology*, 125.2 Obstetrics & Gyenecology 375, 376 (Feb. 2015), https://doi.org/10.1097/AOG.0000000000000637) ("All testing was performed on maternal whole blood samples in cell-free DNA BCT™ tubes received at Illumina within 5 days of the blood draw[.]") (funded by Illumina)); Ex. 29 at 570 (Tracy Futch, *et al.*, *Initial Clinical Laboratory Experience in Noninvasive Prenatal Testing for Fetal Aneuploidy from Maternal Plasma DNA Samples*, 33 Prenatal Diagnostics 569, 570 (2013), https://doi.org/10.1002/pd.4123) ("All testing was performed on maternal whole-blood samples received in cfDNA BCT™ tubes (Streck, Omaha, NE) received within 5 days from blood draw[.]") (funded by VHI); Ex. 30 at 16 (Jay Stoerker, *et al.*, *On the Importance of Clinical Follow-up in The Establishment of Non-Invasive Prenatal Testing (NIPT) for Laboratory Developed Tests*, MOJ Proteomics & Bioinformatics 14, 16 (2017), https://doi.org/10.15406/mojpb.2017.05.00147); Ex. 31 at 151 (Ioanna Kotsopoulou et al., *Non-invasive Prenatal Testing (NIPT): Limitations on*

*the Way to Become Diagnosis*, 2 DE GRUYTER 141, https://doi.org/10.1515/dx-2015-0002 (describing NIPT tests, including Verifi, as "usually performed on maternal blood drawn in specific [circulating cell-free fetal DNA] BCT tubes (Streck) because they have been proved [sic] to minimize increases in background DNA levels caused by temperature fluctuations or agitation that can occur during blood sample storage and shipping").)

44.     The Streck Cell-Free DNA Blood Collection Tube ("BCT") includes an agent that inhibits cell lysis.  A Streck Cell-Free DNA BCT "stabilizes nucleated blood cells.  The unique preservative ***limits the release of genomic DNA, allowing isolation of high-quality cell-free DNA***.  Cell-Free DNA BCT has also been demonstrated to minimize the degradation of circulating tumor cells (CTCs).  By ***limiting cell lysis***, the specialized chemistry provides sample integrity during storage, shipping and handling of blood samples.  Cell-free DNA and gDNA are stable for up to 14 days at 6 °C to 37 °C.  CTCs are stable for up to 7 days at 15 °C to 30 °C."  (Ex. 32 at 2 (https://www.streck.com/products/stabilization/cell-free-dna-bct/#resources) (emphases added).)

45.     In processing the Verifi Tests, Defendants isolate cell-free DNA from a sample of maternal blood collected in a Streck Cell-Free DNA BCT and then analyze the isolated fetal cell-free DNA to detect chromosomal abnormalities as shown below:



(Ex. 33 at 6 (https://www.illumina.com/content/dam/illumina-marketing/documents/clinical/rgh/nipt-verifi-prenatal-test-clinical-evidence-dossier-web.pdf); *see also id.* at 7 ("The test process involves [1] collection of blood at clinics and shipment of the

blood to the testing site, [2] isolation of plasma before cfDNA extraction from the plasma, [3] preparation of DNA libraries, [4] cluster generation and multiplexed sequencing on an Illumina NGS machine, [5] processing of sequencing results, which involves sequence alignment to the human genome and counting of unique tags, [6] sample classification."); Ex. 28 at 376 ("The data presented here were collected or generated as part of cell-free DNA testing for fetal aneuploidy in the Illumina (formerly Verinata Health, Redwood City, CA) noninvasive prenatal testing laboratory that is accredited by the College of American Pathology and certified by the Clinical Laboratory Improvements Amendments Act. Sex chromosome aneuploidy testing is offered as an additional option for women undergoing noninvasive prenatal testing for fetal autosomal aneuploidy (chromosomes 13, 18, and 21). . . . Genome-wide massively parallel sequencing of cell-free DNA isolated from maternal plasma was performed as per previously validated laboratory procedures using methods for sample preparation, sequencing, and analysis that were similar to those reported by Futch et al."); Ex. 29 at 570 ("The [Massively Parallel Sequencing] MPS of cfDNA isolated from maternal plasma was performed as per validated laboratory procedures using methods for sample preparation, sequencing, analysis, and classification . . . . Testing yielded a report that was sent to physicians with results of aneuploidy status for Chr21, Chr18, and Chr13 ('aneuploidy detected', 'no aneuploidy detected', or 'unclassifiable') and MX, if ordered ('detected' or 'not detected').").)

## B.     The Accused VeriSeq Tests

46.     In April 2017, Illumina launched the VeriSeq™ NIPT Solution, an automated solution to allow laboratories to screen for certain fetal chromosomal abnormalities using a single maternal blood draw.   (Ex. 34 (https://www.illumina.com/company/news-center/press-releases/press-release-details.html?newsid=d6bf8efa-3be8-45a8-8f41-450b4e531002).)   In June

2019, Illumina launched the VeriSeq™ NIPT Solution v2, which included screening for a broader range of chromosomal abnormalities than the standard NIPT menu with a single maternal blood draw.  (*See* Ex. 35 (https://www.illumina.com/company/news-center/press-releases/press-release-details.html?newsid=8e4a1ea5-47f8-4bb4-b061-c07275fb0070).)    Defendants  now  offer  the VeriSeq NIPT Solution v2 for sale and provide documentation for both the VeriSeq™ NIPT Solution and VeriSeq™ NIPT Solution v2 (collectively the "VeriSeq Tests") on Illumina's website.    (*See*,  *e.g.*,  Ex.  10  (https://illumina.com/products/by-type/ivd-products/veriseq-nipt.html);  Ex.  36  (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf).)  The VeriSeq Tests are available for purchase in the United States.  (*See* Ex. 10 (https://www.illumina.com/products/by-type/ivd-products/veriseq-nipt.html) (confirming that all VeriSeq products are shipped to the U.S.).)

47.    The VeriSeq Tests are "sequencing-based screening test[s] for the detection of fetal aneuploidies from maternal peripheral whole blood samples in pregnant women of at least 10 weeks  gestation."    (Ex.  36  at  1  (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf);  *see  also*  Ex.  37  at  1 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/veriseq-nipt-v2/veriseq-nipt-solution-v2-package-insert-1000000078751-02.pdf).)   As part of the VeriSeq Tests, maternal blood  samples  are  prepared  using  the  VeriSeq  NIPT  Microlab  Star  System.    (Ex.  10 (https://www.illumina.com/products/by-type/ivd-products/veriseq-nipt.html).)    The  VeriSeq NIPT Microlab Star System automates all workflow steps, including plasma isolation, cfDNA

extraction, and library preparation and quantification. (Ex. 38 (https://www.hamiltoncompany.com/automated-liquid-handling/assay-ready-workstations/veriseq-nipt-microlab-star).)

48.     Illumina, in conjunction with Hamilton Company, created the VeriSeq NIPT Microlab STAR system, which is specifically designed for use in the VeriSeq NIPT workflow. (*See* Ex. 10 (https://www.illumina.com/products/by-type/ivd-products/veriseq-nipt.html); Ex. 38 (https://www.hamiltoncompany.com/automated-liquid-handling/assay-ready-workstations/veriseq-nipt-microlab-star).)  On information and belief, Hamilton Company acts as Illumina's agent in manufacturing the VeriSeq NIPT Microlab STAR system specifically for use with Illumina VeriSeq Tests under the direction and control of Illumina.  Illumina offers for sale and advertises the sale of the VeriSeq NIPT Microlab STAR, including without limitations through its website accessible in the United States and in this District.  (*See* Ex. 10 (https://www.illumina.com/products/by-type/ivd-products/veriseq-nipt.html).)  VeriSeq is a trademark of Illumina.  (Ex. 39 (https://www.illumina.com/company/legal.html).)

49.     The VeriSeq Tests require samples containing an agent that inhibits cell lysis.  For example, the VeriSeq Tests process blood samples collected in Streck Cell-Free BCT tubes.  (*See, e.g.*, Ex. 36 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf) ("**Sample Collection** – 7-10 ml of maternal peripheral whole blood is collected in a Streck cell-free blood collection tube, which prevents cell lysis and genomic contamination and stabilizes whole blood at room temperature."); Ex. 40 (https://science-docs.illumina.com/documents/RGH/veriseq-nipt-solution-v2-data-sheet-1000000032015/veriseq-nipt-solution-v2-data-sheet.pdf) ("The fully automated VeriSeq NIPT

process provides a simple workflow that minimizes technician time and the potential for error. The protocol starts with 7-10 ml of maternal peripheral whole blood collected in the provided Streck Blood Collect Tube (BCT).").)  The VeriSeq Tests **require** the use of Streck Cell-Free DNA BCT. (*See* Ex. 36 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf) ("Whole blood specimens of 7-10 ml collected in Streck Cell-Free DNA BCT must be used.").)

50.   As described above, samples collected in Streck Cell-Free DNA BCT tubes, including blood samples, contain an agent that inhibits cell lysis.  (*See*, *e.g.*, Ex. 32 at 2 (https://www.streck.com/products/stabilization/cell-free-dna-bct/#resources)  (product documentation for the Streck Cell-Free DNA BCT® blood collection tube).)

51.   The VeriSeq Tests isolate and sequence cell-free DNA from a sample of maternal blood collected in a Streck Cell-Free DNA BCT, and then analyze the isolated fetal cell-free DNA to detect chromosomal abnormalities as shown below:



(Ex. 10  (https://www.illumina.com/products/by-type/ivd-products/veriseq-nipt.html);   Ex. 36 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf) ("The VeriSeq NIPT Solution is an in vitro diagnostic test intended for use as a sequencing-based screening test for the detection of fetal aneuploidies from maternal peripheral whole blood samples in pregnant women of at least 10

weeks gestation."); *see also* Ex. 10 (https://illumina.com/products/by-type/ivd-products/veriseq-nipt.html) ("Sample preparation is automated on the VeriSeq NIPT Microlab STAR system, optimized for use in the VeriSeq NIPT workflow."); Ex. 38 (https://www.hamiltoncompany.com/automated-liquid-handling/assay-ready-workstations/veriseq-nipt-microlab-star) ("The VeriSeq NIPT Microlab STAR system screens for specific fetal chromosome abnormalities using maternal blood drawn as early as 10 weeks gestation. All workflow steps, including plasma isolation, cfDNA extraction, library preparation and quantification, and pooling and normalization, are fully automated and vendor-qualified for robust, reliable performance."); Ex. 36 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf) ("**Plasma Isolation** – Within 5 days collection, or within 10 days of collection if stored at 4°C, plasma is isolated from maternal peripheral whole blood using standard centrifugation techniques,  The VeriSeq NIPT Microlab STAR aspirates and dispenses plasma into a 96-well deep-well plate for subsequent processing. . . . **cfDNA Extraction** – Purification of cfDNA from plasma is achieved by adsorption onto a binding plate, washing the binding plate to remove contaminants, and eluting. . . . **Library Preparation** . . . **Quantification** – The library product is quantified using a fluorescent dye with concentration determining comparison to a DNA standard curve. . . . **Library Pooling and Sequencing** . . . **Analysis** . . . **.** Finally these statistical inputs are used to determine the over or under representation of chromosomes 21, 18, 13, X, and Y. The results are summarized in a report where 'aneuploidy detected' or 'no aneuploidy detected' is listed for each target chromosome for samples passing quality control metrics. A fetal fraction estimation is also included for each sample as part of the report.").)

52.     On information and belief, Illumina licenses the right to perform VeriSeq Tests to third party laboratories.  For example, Illumina licenses the VeriSeq software that is required for performing         the         VeriSeq         Tests.         (*See*         Ex.         41         at         17 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-software-guide-1000000001949-03.pdf);         Ex.         42         at         18 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/veriseq-nipt-v2/veriseq-nipt-solution-v2-software-guide-ivd-1000000067940-04.pdf).)   Use of the VeriSeq software also requires         purchase         of         the         VeriSeq         Onsite         Server.         (Ex.         43 (https://support.illumina.com/clinical_support/clinical_kits/veriseq-nipt-solution-v2/faqs.html).)

53.     Illumina has continuous contact and control over the VeriSeq Tests and its users. For example, Illumina provides trainings, site inspections, and continuing support to third-party laboratories   and   other   users   of   the   VeriSeq   Tests.   (*See, e.g.,*   Ex.   10 (https://www.illumina.com/products/by-type/ivd-products/veriseq-nipt.html).)   Illumina Field Service Engineers are assigned the user role of "Service" in the VeriSeq system software and are available to "troubleshoot[], perform[] service repair, set[] up and change[] configuration settings, and   provide[]   ongoing   software   support."   (Ex.   41   at   19-20 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-software-guide-1000000001949-03.pdf).)   Illumina Technical Support updates the Assay Software and Onsite Servers that are part of the VeriSeq Tests.  (*Id.* at 28.)  On information and belief, Illumina also keeps stored data of VeriSeq systems.  (*Id.* at 27 ("The database can be

restored from any given backup snapshot. Restores are done by Illumina Field Service Engineers only.").)  Illumina also provides consumable material required to perform the VeriSeq Tests to third-party laboratories and other users of the VeriSeq Tests.  (*See* Ex. 24 (*Illumina, Inc. v. Natera, Inc.*, Case No. 3:18-cv-01662-SI, D.I. 63 at 6 (N.D. Cal. Sep. 6, 2018)).)

54.     Illumina instructs users to use the VeriSeq Tests as described above, for example, by providing installation, instructions, product manuals, package inserts, checklists, and competency testing to their customers and third-party laboratories.  (*See*, *e.g.*, Ex. 10 (https://www.illumina.com/products/by-type/ivd-products/veriseq-nipt.html).)

55.     Illumina promotes the use of the VeriSeq Tests as described above by "provid[ing] everything needed for NIPT using next-generation sequencing (NGS), including reagents for DNA extraction, library preparation, and sequencing; instrumentation for automated library preparation and sequencing with workflow manager software; an onsite server for secure data storage and analysis; and data analysis software capable of generating clinical reports."  (*Id.*; *see also* Ex. 40 (https://science-docs.illumina.com/documents/RGH/veriseq-nipt-solution-v2-data-sheet-1000000032015/veriseq-nipt-solution-v2-data-sheet.pdf).)   For example, Illumina's VeriSeq software guides the user through every step for performing the VeriSeq Tests.  (*See*, *e.g.*, Ex. 44 (https://www.illumina.com/clinical/reproductive-genetic-health/nipt/in-lab-screening.html) (displaying video entitled, "The VeriSeq NIPT Solution," stating at 00:36–00:42: "Our intuitive software, the VeriSeq NIPT workflow manager, guides you through every step.").)

## C.     The Accused TruSight Tests

56.     On November 5, 2019, Illumina announced the launch of the TruSight™ Oncology 500 ctDNA ("TSO 500 ctDNA"), a liquid biopsy solution for detecting cancer biomarkers.  (Ex. 45   (https://www.illumina.com/company/news-center/feature-articles/TSO-500-NovaSeq.html).)

Illumina began shipping TSO 500 ctDNA at least by April 24, 2020. (Ex. 46 (https://www.illumina.com/company/news-center/feature-articles/trusight-oncology-family-grows-with-liquid-biopsy-and-high-throu.html).)

57.    On November 7, 2016, Illumina announced the launch of TruSight® Tumor 170, a next-generation sequencing solution, targeting cancer related genetic aberrations. (Ex. 47 (https://www.illumina.com/company/news-center/press-releases/press-release-details.html?newsid=e7bbfe59-14cd-4c23-b45c-027a3cba34c5).) On April 12, 2018, Illumina published notes regarding the use of its TruSight™ Oncology UMI Reagents with TruSight® Tumor 170 DNA Content for Detection of Low-Frequency Variants in Cell-Free DNA. (Ex. 48 (https://support.illumina.com/sequencing/sequencing_kits/trusight-tumor-170-kit/documentation.html).)

58.    Defendants offer for sale and provide documentation for the TSO 500 ctDNA and the TruSight® Tumor 170 with the TruSight™ Oncology UMI Reagents (collectively, the "TruSight Tests") on Illumina's website. (*See*, *e.g.*, Ex. 11 (https://www.illumina.com/products/trusight-panels.html); Ex. 49 (https://www.illumina.com/products/by-type/clinical-research-products/trusight-oncology-500-ctdna.html); Ex. 50 (https://www.illumina.com/products/by-type/clinical-research-products/trusight-oncology-umi.html).) On information and belief, Defendants publish and provide documentation for using the TruSight Tests to process samples of cfDNA that contain an agent that inhibits cell lysis. For example, Defendants have published papers regarding the TruSight Tests that demonstrate their use with samples collected in Streck Cell-Free BCT tubes. (*See* Ex. 51 (https://support.illumina.com/content/dam/illumina-marketing/documents/products/appnotes/cfdna-quantification-tech-note-1170-2020-001.pdf); Ex.

52                          (https://support.illumina.com/content/dam/illumina-

marketing/documents/products/appnotes/trusight-umi-trusight-tumor-170-app-note-

1000000050427.pdf);       Ex.        53        (https://www.illumina.com/content/dam/illumina-

marketing/documents/products/technotes/trusight-umi-cfDNA-control-technote-1170-2017-

020.pdf).)

    59.   The TruSight Tests are sequencing panels that "target[] genes and regions thought

to    be    relevant    for    particular    diseases    or    conditions."    (Ex.    11

(https://www.illumina.com/products/trusight-panels.html).)  For example, the TSO 500 ctDNA is

an "NGS-based assay that assesses multiple variant types in 523 cancer-related genes from cell-

free   DNA   (cfDNA)."   (Ex. 49 (https://www.illumina.com/products/by-type/clinical-research-

products/trusight-oncology-500-ctdna.html).)  The TSO 500 ctDNA analyzes cfDNA extracted

from    blood    samples.       (Ex.    51    (https://support.illumina.com/content/dam/illumina-

marketing/documents/products/appnotes/cfdna-quantification-tech-note-1170-2020-001.pdf)

("The first step in obtaining cfDNA is to collect a blood sample. . . . cfDNA-containing plasma

from blood cells, which will aggregate at the bottom of the tube. After blood collection, the tubes

are centrifuged to separate the cfDNA-containing plasma from blood cells, which will aggregate

at the bottom of the tube. The plasma can then be easily removed from the top of the tube and

cfDNA extracted using a magnetic bead–based or silica membrane–based extraction kit.").)  The

TruSight™ Oncology UMI Reagents with TruSight 170 DNA Content is also used to process and

analyze    cfDNA    extracted    from    blood    samples.    (Ex.    52

(https://support.illumina.com/content/dam/illumina-

marketing/documents/products/appnotes/trusight-umi-trusight-tumor-170-app-note-

1000000050427.pdf) ("Blood collection was performed with two different methods to provide

cfDNA samples . . . .   For both blood sample types, DNA was extracted with the QIAamp Circulating Nucleic Acid Kit (QIAGEN) . . . .").)

60.     The TruSight Tests use samples of cfDNA that contain an agent that inhibits cell lysis.  For example, the TSO 500 ctDNA workflow processes blood samples collected in Streck Cell-Free BCT tubes.   (*See, e.g.*, Ex. 51 (https://support.illumina.com/content/dam/illumina-marketing/documents/products/appnotes/cfdna-quantification-tech-note-1170-2020-001.pdf) ("The first step in obtaining cfDNA is to collect a blood sample. . . .  Another commonly used tube type is the Streck Cell-free DNA BCT (blood collection tube). In addition to preventing blood clotting, the Streck BCT uses a preservative to stabilize nucleated blood cells, preventing the release of gDNA and allowing isolation of high-quality cfDNA. This also increases the time that blood can be stored in the tube before further processing.").)  The TruSight™ Oncology UMI Reagents with TruSight® Tumor 170 workflow also processes blood samples collected in Streck Cell-Free BCT tubes.   (*See*, *e.g.*, Ex. 52 (https://support.illumina.com/content/dam/illumina-marketing/documents/products/technotes/trusight-umi-trusight-tumor-170-app-note-1000000050427.pdf ) ("**cfDNA-Streck**: Blood samples from healthy individuals were collected in Cell-Free DNA BCT blood collection tubes (Streck) and kept at room temperature for up to two days   prior   to   processing.");   Ex.   53   (https://www.illumina.com/content/dam/illumina-marketing/documents/products/technotes/trusight-umi-cfDNA-control-technote-1170-2017-020.pdf) ("cfDNA: Blood from healthy individuals (n=7) was collected in Cell-Free DNA BCT blood collection tubes (Streck), and DNA was extracted with  the QIAamp Circulating Nucleic Acid kit (QIAGEN).").)

61.     As described above, samples collected in Streck Cell-Free DNA BCT tubes, including blood samples, contain an agent that inhibits cell lysis.  (*See*, *e.g.*, Ex. 32 at 2

(https://www.streck.com/products/stabilization/cell-free-dna-bct/#resources)                (product

documentation for the Streck Cell-Free DNA BCT® blood collection tube).)

     62.     The TSO 500 ctDNA sequences and analyzes cell-free DNA isolated from blood

samples collected in a Streck Cell-Free DNA BCT to detect somatic variants in circulating tumor

DNA as shown below:



(Ex.                54                (https://support.illumina.com/content/dam/illumina-

marketing/documents/products/datasheets/trusight-oncology-500-ctdna-data-sheet-1170-2019-

006.pdf);        Ex.        55        at        1        (https://support.illumina.com/content/dam/illumina-

support/documents/documentation/chemistry_documentation/trusight/oncology-500-

ctdna/trusight-oncology-500-ctDNA-reference-guide-1000000092559-00.pdf) ("The TruSight™

Oncology 500 Circulating Tumor DNA (ctDNA) protocol describes an enrichment-based

approach to convert cell-free DNA (cfDNA) extracted from plasma samples into libraries enriched

for cancer-related genes that can be sequenced on Illumina® sequencing systems."); Ex. 51

(https://support.illumina.com/content/dam/illumina-

marketing/documents/products/appnotes/cfdna-quantification-tech-note-1170-2020-001.pdf)

("For accurate analysis of cfDNA, Illumina offers the TruSight Oncology 500 ctDNA solution.

This NGS assay for liquid biopsy analyzes cfDNA to detect microsatellite instability (MSI) and

tumor mutational burden (TMB) biomarkers and profiles 523 genes for single-nucleotide variants

(SNVs), indels, copy-number variants (CNVs), and gene rearrangements. . . . **cfDNA collection** The first step in obtaining cfDNA is to collect a blood sample. Various blood collection tube types exist today. . . . Another commonly used tube type is the Streck Cell-free DNA BCT (blood collection tube). . . . After blood collection, the tubes are centrifuged to separate the cfDNA-containing plasma from blood cells, which will aggregate at the bottom of the tube. The plasma can then be easily removed from the top of the tube and cfDNA extracted using a magnetic bead-based or silica membrane-based extraction kit. **cfDNA quantification** To achieve optimal performance with the TruSight Oncology 500 ctDNA assay, a minimum input of 30 ng mononucleosomal cfDNA is recommended. That input is calculated based on quantification of the mononucleosomal fraction of cfDNA fragments.").)

63.     The TruSight™ Oncology UMI Reagents with the TruSight® Tumor 170 sequences and analyzes cell-free DNA isolated from blood samples collected in a Streck Cell-Free DNA BCT to detect somatic variants in circulating tumor DNA as shown below:



(Ex. 56 at 1 (https://www.illumina.com/content/dam/illumina-marketing/documents/products/datasheets/trusight-oncology-umi-reagents-datasheet-1000000050425.pdf); *see also* Ex. 52 at 1-2 (https://support.illumina.com/content/dam/illumina-marketing/documents/products/appnotes/trusight-umi-trusight-tumor-170-app-note-1000000050427.pdf ) ("To explore the possibility of analyzing cancer-related genes in cfDNA, targeted molecular analysis was performed using the TruSight™ Oncology UMI Reagents paired with DNA content from TruSight Tumor 170. . . . To demonstrate compatibility of the TruSight™ Oncology UMI Reagents with different sequencing instruments, cfDNA-Streck and nucleosomal control DNA samples were processed and sequenced on the HiSeq 2500, HiSeq 4000, and NovaSeq 6000 Systems. After error correction, the average reduced error rate was calculated.").) On information and belief, Illumina markets and sells the TruSight™ Oncology UMI Reagents to be paired with the TruSight® Tumor 170 for processing and testing cfDNA samples.  (*See* Ex. 57 (https://www.illumina.com/products/by-type/clinical-research-products/trusight-oncology-umi.html).)  Illumina's marketing materials and website state that the TruSight™ Oncology UMI Reagents "reduce background noise in sequencing data, enabling detection of low-frequency variants, such as those found in cell-free DNA (cfDNA)."  (*See id.*)

64.    On information and belief, Illumina licenses the right to perform TruSight Tests to third party laboratories.  For example, Illumina licenses the TruSight Oncology 500 ctDNA analysis software that is required for performing the TSO 500 ctDNA workflow.  (*See* Ex. 58 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/trusight/oncology-500-ctdna/Trusight-Oncology-500-ctDNA-EULA.pdf).)   Illumina also partners with third party laboratories  to  validate  clinical  effectiveness  of  its  TruSight  Tests.   (*See*, *e.g.*, Ex 59

(https://frederick.cancer.gov/news/frederick-national-laboratory-partners-illumina-clinical-validation-liquid-biopsies).)

65.     On information and belief, Illumina has continuous contact and control over the TruSight Tests and its users.  For example, Illumina provides trainings, site inspections, and continuing support to third-party laboratories and other users of the TruSight Tests.  (*See*, *e.g.*, Ex. 49   (https://www.illumina.com/products/by-type/clinical-research-products/trusight-oncology-500-ctdna.html).)

66.     Illumina instructs users to use the TruSight Tests as described above, for example, by providing instructions, product manuals, package inserts, checklists, and reference guides, and support documentation to their customers and third-party laboratories.   (*See*, *e.g.*, Ex. 49 (https://www.illumina.com/products/by-type/clinical-research-products/trusight-oncology-500-ctdna.html);   Ex.   57   (https://www.illumina.com/products/by-type/clinical-research-products/trusight-oncology-umi.html).)   On information and belief, the documentation and instructions Illumina provides to its users include the use of the TruSight Tests for analysis of samples collected in Streck cfDNA BCTs.

67.     Illumina promotes the use of the TruSight Tests as described above by requiring cfDNA extracted from plasma samples for its TSO 500 ctDNA assay and by providing its customers and third-party laboratories with validation of the effectiveness of analysis of cfDNA obtained   from   Streck   cfDNA   BCTs.   (*See,   e.g.*   Ex.   55 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/trusight/oncology-500-ctdna/trusight-oncology-500-ctDNA-reference-guide-1000000092559-00.pdf); Ex. 52 at 1, 4 (https://www.illumina.com/content/dam/illumina-

marketing/documents/products/technotes/trusight-umi-trusight-tumor-170-app-note-1000000050427.pdf) (documenting the effectiveness of using TruSight™ Oncology UMI Reagents with TruSight® Tumor 170 DNA Content for detecting low-frequency variants in cfDNA obtained and isolated from Streck Tubes).) For example, Illumina provides documentation on "optimizing quantification of cfDNA from liquid biopsy samples to maximize performance" that touts the benefits of using Streck BCTs to collect blood samples, including that "[i]n addition to preventing blood clotting, the Streck BCT uses a preservative to stabilize nucleated blood cells, preventing the release of gDNA and allowing isolation of high-quality cfDNA" and that using Streck cfDNA BCTs "increases the time that blood can be stored in the tube before further processing." (Ex. 51 at 1 (https://www.illumina.com/content/dam/illumina-marketing/documents/products/appnotes/cfdna-quantification-tech-note-1170-2020-001.pdf).)

## D.     Defendants' Knowledge Of The Ravgen Patents

68.     The Patents-in-Suit claim advancements in the genetic testing industry in which Defendants actively participate and are widely acclaimed as breakthroughs in genetic testing. On information and belief, Defendants have been aware of the Patents-in-Suit and the fact that performance of the Defendants' cell-free DNA tests, including the Verifi, VeriSeq, and TruSight Tests, practice the claimed inventions of those patents since at least the launch date of each of the infringing products.

69.     Defendants have been and are assignees of a number of patents and patent applications that are related to subject matter similar to the Patents-in-Suit and that were filed after the Patents-in-Suit were published. On information and belief, in researching the patentability of their own patents, Defendants did, or at a minimum should have, become aware of the Patents-in-Suit.

70. The Patents-in-Suit and their corresponding patent application publications were cited, either by Defendants or by an examiner, during prosecution of Defendants' own patent applications at the United States Patent and Trademark Office. As persons skilled in the art, Defendants, upon learning of, reviewing, and/or citing the Patents-in-Suit in the numerous instances set forth below, knew or were willfully blind to the fact that their infringing products practiced the Patents-in-Suit.

71. Ravgen's '277 Patent or the application that matured into Ravgen's '277 Patent (U.S. Patent Application Publication No. 2004/0137470) was cited during the prosecution of Defendants' U.S. Patent Nos. 8,137,912; 8,168,389; 8,318,430; 8,372,584; 8,532,936; 9,017,942; 9,115,401; 9,260,745; 9,273,355; 9,323,888; 9,347,100; 9,411,937; 9,447,453; 9,493,828; 9,493,831; 9,657,342; 10,041,119; 10,155,984; 10,388,403; 10,415,089; 10,435,751; 10,482,993; 10,586,610; 10,591,391; 10,612,096; 10,658,070; 10,662,474; 10,704,090; and 10,718,020.

72. Ravgen's '277 Patent or the application that matured into Ravgen's '277 Patent (U.S. Patent Application Publication No. 2004/0137470) was cited during the prosecution of Defendants' U.S. Patent Application Publication Nos. 2008/0050739; 2008/0070792; 2008/0138809; 2008/0220422; 2009/0280492; 2010/0291572; 2010/0304978; 2011/0201507; 2011/0224087; and 2011/0230358.

73. Ravgen's '720 Patent or the application that matured into Ravgen's '720 Patent (U.S. Patent Application Publication No. 2006/0121452) was cited during the prosecution of Defendants' U.S. Patent Nos. 8,137,912; 8,168,389; 8,318,430; 8,372,584; 9,017,942; 9,115,401; 9,260,745; 9,273,355; 9,323,888; 9,347,100; 9,411,937; 9,447,453; 9,493,828; 9,493,831; 9,657,342; 10,041,119; 10,155,984; 10,388,403; 10,415,089; 10,435,751; 10,482,993; 10,586,610; 10,591,391; 10,612,096; 10,658,070; 10,662,474; 10,704,090; and 10,718,020.

74.     Ravgen's '720 Patent or the application that matured into Ravgen's '720 Patent (U.S. Patent Application Publication No. 2006/0121452) was cited during the prosecution of Defendants' U.S. Patent Application Publication Nos. 2008/0050739; 2008/0070792; 2008/0138809; 2008/0220422; 2009/0280492; 2010/0136529; 2010/0291572; 2010/0304978; 2011/0201507; 2011/0224087; 2011/0230358; 2012/0135872; 2012/0214678; 2012/0264121; 2013/0029852; 2013/0034546; and 2013/0096011.

75.     Defendants were also aware of the Patents-in-Suit through *inter partes* review proceedings at the Patent Trial and Appeal Board (PTAB).

76.     VHI was a party in Case Nos. IPR2013-00276 and IPR2013-00277 at the PTAB.

77.     The petitions in each of Case Nos. IPR2013-00276 and IPR2013-00277 included grounds asserting Ravgen's '277 Patent as prior art against certain claims of VHI's U.S. Patent No. 8,318,430.  (*See generally* Ex. 60 (*Ariosa Diagnostics v. Verinata Health, Inc.*, IPR2013-00276, Paper No. 1); Ex. 61 (*Ariosa Diagnostics v. Verinata Health, Inc.*, IPR2013-00277, Paper No. 1).)  The petitions were filed and served on VHI on May 10, 2013.  (Ex. 60 at 57; Ex. 61 at 55.)

78.     VHI advanced substantive arguments regarding Ravgen's '277 patent during Case Nos. IPR2013-00276 and IPR2013-00277 at the PTAB.  VHI also advanced substantive arguments regarding Ravgen's '277 patent during related appeals at the Federal Circuit in Case Nos. 2015-1215 and 2015-1226.

79.     Illumina was a party in Case No. IPR2018-01317 at the PTAB.

80.     Illumina submitted Ravgen's '277 Patent as an exhibit with Illumina's Patent Owner Preliminary Response in Case No. IPR2018-01317.  (Ex. 62 (*Natera, Inc. v. Illumina, Inc.*, IPR2018-01317, Paper No. 7 (PTAB October 17, 2018)) at Exhibit List, Page 1; *see also id.* at 8.)

81.    Illumina initiated and was a party in Case No. IPR2019-01201 at the PTAB.

82.    The petition in Case No. IPR2019-01201 included grounds asserting Ravgen's '277 Patent as prior art against certain challenged claims.  (*See generally* Ex. 63 (*Illumina, Inc. v. Natera, Inc.*, IPR2019-01201, Paper No. 1).)  The petition was filed by Illumina on June 13, 2019. (*Id.* at 71.)

83.    Illumina advanced substantive arguments regarding Ravgen's '277 patent during Case No. IPR2019-01201 at the PTAB.

84.    Defendants were also aware of the Patents-in-Suit through reexamination proceedings at the United States Patent and Trademark Office.

85.    A request for reexamination in Reexamination No. 90/013,678 (the "'678 Reexamination") was filed on January 8, 2016, and challenged certain claims of VHI's U.S. Patent No. 8,318,430.  (*See* Ex. 64 (Request for Reexamination).)  The request asserted Ravgen's '277 Patent and the application that matured into the Ravgen's '720 Patent (U.S. Patent Application Publication No. 2006/0121452) as prior art to the challenged claims of VHI's patent.  (*See id.* at 8.)

86.    VHI filed motions at the PTAB to termination the '678 Reexamination on February 2, 2016.  (*See* Ex. 65 (*Ariosa Diagnostics v. Verinata Health, Inc.*, IPR2013-00276, Paper No. 55).)  In its motions, VHI characterized Ravgen's '277 Patent and the application that matured into the Ravgen's '720 Patent (U.S. Patent Application Publication No. 2006/0121452) as "two different closely related versions of the Dhallan reference."  (*Id.* at 4.)

87.    Defendants were also aware of the Patents-in-Suit through communications with Dr. Dhallan and Ravgen regarding Ravgen's technology and patent portfolio.

88.     On January 21, 2009, Artemis Health, through Grainger Greene, an Intellectual Property and Business Development Associate at Artemis Health, contacted Ravgen.  (Ex. 66 (Greene Emails dated January 21, 2009 through February 4, 2009).)  Mr. Green indicated Artemis Health was looking to expand its intellectual property portfolio and was interested in discussing Ravgen's U.S. Patent No. 7,442,506 (the "'506 Patent").  (*Id.* at 1.)  The '506 Patent was filed on the same day as the '720 Patent and claims priority to the '277 Patent.  (Ex. 67 ('506 Patent) at Cover.)

89.     Mr. Greene then emailed Dr. Dhallan on February 4, 2009 to confirm a call scheduled for that day.  (Ex. 66 at 1.)  Mr. Greene indicated that Lissa Goldenstein, CEO of Artemis Health, would be joining the call that day.  (*Id.*)

90.     Artemis Health changed its name and became VHI in April 2011.  (Ex. 68 (VHI Press Release, April 26, 2011).)

91.     On May 3, 2016, after Illumina's acquisition of VHI, Frank Garofalo contacted Nick Naclerio at Illumina to discuss Ravgen's technology and patent portfolio.  (Ex. 69 (Garofalo Emails dated May 3, 2016 through June 3, 2016) at 4-5.)  That same day, Mr. Garofalo followed up with an email to Charles Moehle, VP Licensing & Business Development at Illumina, and introduced himself as an advisor for Ravgen.  (*Id.* at 4.)  Mr. Garofalo provided a summary of Ravgen's patent portfolio.  (*Id.* at 4-5.)  The Ravgen patent portfolio—both at that time and today—is composed of seven issued U.S. patents, including the two Patents-in-Suit.

92.     Mr. Garofalo and Mr. Moehle communicated by telephone to discuss Ravgen's technology.  (*Id.* at 2-3.)  Mr. Moehle suggested an in person meeting at Illumina's facility in California, and Mr. Garofalo followed up to schedule the in person meeting on May 25, 2016.  (*Id.* at 2.)  Mr. Garofalo explained that the summary of Ravgen's patent portfolio that he previously

provided would give an introduction to Ravgen's patent portfolio that Ravgen wished to discuss with Illumina.  (*Id.*)

93.     Mr. Garofalo and Dr. Dhallan met in person with Illumina employees during the week of June 6, 2016, to discuss Ravgen's technology and intellectual property portfolio.  (*Id.* at 1; Ex. 70 (Garofalo Emails dated June 10, 2016).)  Mr. Moehle was present at that in person meeting.  (*Id.* at 1.)  Following the meeting, Mr. Moehle indicated Illumina would "need to have a couple of internal meetings to review the information [Mr. Garofalo and Dr. Dhallan] provided" before responding in substance.  (*Id.*)  Mr. Moehle indicated that review would "probably take one or two weeks."  (*Id.*)

94.     Additionally, to the extent Illumina was not aware of the Patents-in-Suit prior to 2013, Illumina became aware of the Patents-in-Suit when it completed its acquisition of VHI in 2013.

95.     Despite their knowledge of the Patents-in-Suit and of their infringement of those patents, Defendants have continued to willfully infringe the Patents-in-Suit so as to obtain the significant benefits of Ravgen's innovations without paying compensation to Ravgen.  For example, Defendants have continued to use the claimed methods in their VeriSeq, Verifi, and TruSight Tests without a license, and, on information and belief, have generated hundreds of millions of dollars in revenue from their infringement.  Additionally, after becoming aware of the Patents-in-Suit, Defendants proceeded to commercialize the VeriSeq, Verifi, and TruSight Tests built on and including the claimed inventions of the Patents-in-Suit without entering into a license to the Patents-in-Suit.

## COUNT I

### (Infringement Of The '277 Patent)

96.    Ravgen incorporates by reference paragraphs 1–95.

97.    The '277 Patent is valid and enforceable.

98.    Defendants have infringed, and continue to infringe, one or more claims of the '277 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, products and/or methods encompassed by those claims, including Defendants' Verifi Tests and VeriSeq Tests.

99.    As one example, Defendants infringe at least Claim 81 of the '277 Patent by using the Verifi Tests.  For example, use of the Verifi Tests requires using a method for preparing a sample for analysis, wherein said method comprises:

   a.   isolating free fetal nucleic acid (such as cell-free fetal DNA) from a sample (such as a maternal blood sample) (*see, e.g.*, Ex. 33 at 6-7 (https://www.illumina.com/content/dam/illumina-marketing/documents/clinical/rgh/nipt-verifi-prenatal-test-clinical-evidence-dossier-web.pdf) ("The test utilizes next-generation sequencing (NGS) of circulating cell-free DNA (cfDNA) extracted from a maternal blood sample to screen for aneuploidy. . . . The test process involves [1] collection of blood at clinics and shipment of the blood to the testing site, [2] isolation of plasma before cfDNA extraction from the plasma.")),

   b.   wherein said sample comprises an agent that inhibits lysis of cells, if cells are present, and wherein said agent is selected from the group consisting of

36

membrane stabilizer, cross-linker, and cell lysis inhibitor (such as cell-free DNA

Streck tubes filled with maternal blood) (*see, e.g.*, Ex. 28 at 1 (explaining that

"maternal whole blood samples in cell-free DNA BCT® tubes" are sent to

Illumina for Verifi testing); Ex. 32 at 2

(https://www.streck.com/products/stabilization/cell-free-dna-bct/#resources)

(describing Streck cell-free DNA BCTs as containing a "unique preservative

[which] limits the release of genomic DNA, allowing isolation of high-quality

cell-free DNA" and "specialized chemistry" that "***limit[s] cell lysis***") (emphasis

added)).

100.    Defendants have infringed, and continue to infringe, one or more claims of the '277

Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by using

the Verifi Tests either themselves and/or by directing and/or controlling the performance of the

claimed steps by third-party laboratories performing the Verifi Tests.  For example, Defendants

use the Verifi Tests by collecting and analyzing samples sent to Defendants' laboratories for

processing.                      (*See,              e.g.*,              Ex.              9

(https://www.illumina.com/clinical/illumina_clinical_laboratory/verifi-prenatal-tests.html)

("Physicians can order this Illumina service through our network of partner labs. Samples are

processed at our CLIA-certified, CAP-accredited lab within 3-5 days. . . .  The Verifi Prenatal Test

was developed by, and its performance characteristics were determined by Verinata Health, Inc.

(VHI), a wholly owned subsidiary of Illumina, Inc. The VHI laboratory is CAP-accredited[.]").)

On information and belief, Illumina has the right and the ability to direct and control the activities

of VHI in several ways, including through Illumina's 100% ownership of VHI, through instituting

programs and measures (such as policies or protocols) at VHI, and through interim instructions

via at least Illumina's employees and/or officers who hold leadership roles at VHI.  Further, VHI

acts on behalf of Illumina, including when VHI performs tests on Illumina's behalf for Illumina's

patients, or provides test results to health care providers and/or patients on Illumina's behalf.  (*Id.*)

101.    In addition or in the alternative, Defendants have also induced infringement, and

continue to induce infringement, of one or more claims of the '277 Patent under 35 U.S.C. §

271(b).  Defendants actively, knowingly, and intentionally induce infringement of the '277 Patent

by selling or otherwise supplying the Verifi Tests with the knowledge and intent that third-party

laboratories will use the Verifi Tests supplied by Defendants to infringe the '277 Patent.

Defendants act with the knowledge and intent to encourage and facilitate third-party infringement

through the dissemination of the Verifi Tests and/or the creation and dissemination of supporting

materials, instructions, product manuals, and/or technical information related to the Verifi Tests.

102.    Defendants specifically intend and are aware that the ordinary and customary use

of the Verifi Tests by their customers and partners would infringe the '277 Patent.  For example,

Defendants sell and provide the Verifi Tests, which when used in their ordinary and customary

manner intended and instructed by Defendants, infringe one or more claims of the '277 Patent,

including at least claim 81.  On information and belief, Defendants further provide product

manuals and other instructional materials that cause their customers and partners to operate the

Verifi   Tests   for   their   ordinary   and   customary   use.   (*See,   e.g.*,   Ex.   9

(https://www.illumina.com/clinical/illumina_clinical_laboratory/verifi-prenatal-tests.html)

("Physicians can order this Illumina service through our network of partner labs.").)  Defendants

accordingly induce third parties to use Verifi Tests in their ordinary and customary way to infringe

the '277 Patent, knowing, or at least being willfully blind to the fact, that such use constitutes

infringement of the '277 Patent.

103.    In addition or in the alternative, Defendants contribute to the infringement by third parties, such as health care providers or laboratories, of one or more claims of the '277 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the Verifi Tests, knowing that those products constitute a material part of the inventions of the '277 Patent, knowing that those products are especially made or adapted to infringe the '277 Patent, and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

104.    As another example, Defendants infringe at least Claim 81 of the '277 Patent by making, selling and/or offering for sale in the United States, and/or importing into the United States, the VeriSeq Tests.  For example, use of the VeriSeq Tests requires using a method for preparing a sample for analysis, wherein said method comprises:

    a.   isolating free fetal nucleic acid (such as cell-free fetal DNA) from a sample (such as a maternal blood sample) (*see, e.g.*, Ex. 36 at 2 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf) ("**cfDNA Extraction** – Purification of cfDNA from plasma is achieved by adsorption onto a binding plate, washing the binding plate to remove contaminants, and eluting")),

    b.   wherein said sample comprises an agent that inhibits lysis of cells, if cells are present, and wherein said agent is selected from the group consisting of membrane stabilizer, cross-linker, and cell lysis inhibitor (such as cell-free DNA Streck tubes filled with maternal blood) (*see, e.g.*, Ex. 37 at 2

(https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/veriseq-nipt-v2/veriseq-nipt-solution-v2-package-insert-1000000078751-02.pdf) ("**Sample Collection** – 7–10 ml of maternal peripheral whole blood is collected in a Streck cell-free DNA Blood Collection Tube (BCT), which prevents cell lysis and genomic contamination and stabilizes whole blood."); Ex. 36 at 2 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf) ("**Sample Collection** – 7-10 of maternal peripheral whole blood is collected in a Streck cell-free blood collection tube, which prevents cell lysis and genomic contamination and stabilizes whole blood at room temperature."); Ex. 32 at 2 (https://www.streck.com/products/stabilization/cell-free-dna-bct/#resources) (describing Streck cell-free DNA BCTs as containing a "unique preservative [which] limits the release of genomic DNA, allowing isolation of high-quality cell-free DNA" and "specialized chemistry" that "*limit[s] cell lysis*") (emphasis added)).

105.   Defendants have infringed, and continue to infringe, one or more claims of the '277 Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by using the VeriSeq Tests either themselves and/or by directing and/or controlling the performance of the claimed steps by third-party laboratories performing the VeriSeq Tests.

106.   To the extent Hamilton or another third party manufactures or sells individual components of the VeriSeq Tests, that sale is attributable to Illumina at least because Illumina has

an agency or contractual relationship with said third party, and/or Illumina controls or directs the performance of said third party.  For example, Illumina controls or directs the manufacture and/or sales of the VeriSeq NIPT Microlab STAR system.  The VeriSeq NIPT Microlab STAR system is configured specifically for use with Illumina's VeriSeq NIPT Workflow Manager Software and is created specifically for use with the Illumina VeriSeq Tests.  (Ex. 38 (https://www.hamiltoncompany.com/automated-liquid-handling/assay-ready-workstations/veriseq-nipt-microlab-star).)  Illumina also profits from Hamilton Company's use of Illumina's intellectual property, the VeriSeq trademark.

107.    In addition or in the alternative, Defendants have induced infringement, and continue to induce infringement, of one or more claims of the '277 Patent under 35 U.S.C. § 271(b).  Defendants actively, knowingly, and intentionally induce infringement of the '277 Patent by selling or otherwise supplying the VeriSeq Tests with the knowledge and intent that third-party laboratories will use the VeriSeq Tests supplied by Defendants to infringe the '277 Patent.  Defendants act with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the VeriSeq Tests and/or the creation and dissemination of supporting materials, instructions, product manuals, and/or technical information related to the VeriSeq Tests.

108.    Defendants specifically intend and are aware that the ordinary and customary use of the VeriSeq Tests would infringe the '277 Patent.  For example, Defendants sell and provide the VeriSeq Tests, which when used in their ordinary and customary manner intended and instructed by Illumina, infringe one or more claims of the '277 Patent, including at least claim 81.  On information and belief, Defendants further provide product manuals and other instructional materials that cause their customers and partners to operate the VeriSeq Tests for their ordinary and customary use.  Defendants accordingly induce third parties to use VeriSeq Tests in their

ordinary and customary way to infringe the '277 Patent, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the '277 Patent.

109.    In addition or in the alternative, Defendants have contributed to the infringement by third parties, such as health care providers or laboratories, and continue to contribute to infringement by third parties, of one or more claims of the '277 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the VeriSeq Tests, knowing that those products constitute a material part of the inventions of the '277 Patent, knowing that those products are especially made or adapted to infringe the '277 Patent, and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

110.    Defendants have had knowledge of and notice of the '277 Patent and their infringement since at least the launch date of each of the infringing products.

111.    Defendants' infringement of the '277 Patent has been, and continues to be, willful and deliberate since at least the launch date of each of the infringing products.

112.    Ravgen has been and continues to be damaged by Defendants' infringement of the '277 Patent, and will suffer irreparable injury unless the infringement is enjoined by this Court.

113.    Defendants' conduct in infringing the '277 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## COUNT II

### Infringement Of The '720 Patent

114.    Ravgen incorporates by reference paragraphs 1–113.

115.    The '720 Patent is valid and enforceable.

42

116.     Defendants have infringed, and continue to infringe, one or more claims of the '720 Patent under 35 U.S.C. § 271, either literally and/or under the doctrine of equivalents, by making, using, selling, and/or offering for sale in the United States, and/or importing into the United States, products and/or methods encompassed by those claims, including Defendants' Verifi, VeriSeq, and TruSight Tests.

117.     As one example, Defendants infringe at least claim 1 of the '720 patent by using the Verifi Tests.  For example, use of the Verifi Tests requires using a method for detecting a free nucleic acid, wherein said method comprises:

    a.   isolating free nucleic acid (such as cell-free DNA) from a non-cellular fraction of a sample (such as a maternal blood sample) (*see, e.g.*, Ex. 33 at 6-7 (https://www.illumina.com/content/dam/illumina-marketing/documents/clinical/rgh/nipt-verifi-prenatal-test-clinical-evidence-dossier-web.pdf) ("The test utilizes next-generation sequencing (NGS) of circulating cell-free DNA (cfDNA) extracted from a maternal blood sample to screen for aneuploidy. . . . The test process involves [1] collection of blood at clinics and shipment of the blood to the testing site, [2] isolation of plasma before cfDNA extraction from the plasma.")),

    b.   wherein said sample comprises an agent that impedes cell lysis, if cells are present, and wherein said agent is selected from the group consisting of membrane stabilizer, cross-linker, and cell lysis inhibitor (*see, e.g.*, Ex. 28 at 1 (explaining that  "maternal whole blood samples in cell-free DNA BCT® tubes" are sent to Illumina for Verifi testing); Ex. 32 at 2 (https://www.streck.com/products/stabilization/cell-free-dna-bct/#resources)

43

(describing Streck cell-free DNA BCTs as containing a "unique preservative [which] limits the release of genomic DNA, allowing isolation of high-quality cell-free DNA" and "specialized chemistry" that "*limit[s] cell lysis*") (emphasis added)),

c.  detecting the presence or absence of the free nucleic acid (Ex. 33 at 6-7 (https://www.illumina.com/content/dam/illumina-marketing/documents/clinical/rgh/nipt-verifi-prenatal-test-clinical-evidence-dossier-web.pdf) ("The verifi Prenatal Test harnesses the power of whole-genome sequencing (WGS) with a highly optimized algorithm. . . .  Verinata Health (a subsidiary of Illumina) developed a proprietary algorithm, SAFeR™ (Selective Algorithm for Fetal Results), to detect trisomy 21 and trisomy 18.")).

118.    Defendants have infringed, and continue to infringe, one or more claims of the '720 Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by using the Verifi Tests either themselves and/or by directing and/or controlling the performance of the claimed steps by third-party laboratories performing the Verifi test.  For example, Defendants use the Verifi test by collecting and analyzing samples sent to Defendants' laboratories for processing. (*See, e.g.*, Ex. 9 (https://www.illumina.com/clinical/illumina_clinical_laboratory/verifi-prenatal-tests.html) ("Physicians can order this Illumina service through our network of partner labs. Samples are processed at our CLIA-certified, CAP-accredited lab within 3-5 days. . . . The Verifi Prenatal Test was developed by, and its performance characteristics were determined by Verinata Health, Inc. (VHI), a wholly owned subsidiary of Illumina, Inc. The VHI laboratory is CAP-accredited[.]").)  On information and belief, Illumina has the right and the ability to direct and control the activities of VHI in several ways, including through Illumina's 100% ownership

of VHI, through instituting programs and measures (such as policies or protocols) at VHI, and through interim instructions via at least Illumina's employees and/or officers who hold leadership roles at VHI.  Further, VHI acts on behalf of Illumina, including when VHI performs tests on Illumina's behalf for Illumina's patients, or provides test results to health care providers and/or patients on Illumina's behalf.  (*Id.*)

119.    In addition or in the alternative Defendants have also induced infringement, and continue to induce infringement, of one or more claims of the '720 Patent under 35 U.S.C. § 271(b).  Defendants actively, knowingly, and intentionally induce infringement of the '720 Patent by selling or otherwise supplying the Verifi Tests with the knowledge and intent that third-party laboratories will use the Verifi Tests supplied by Defendants to infringe the '720 Patent. Defendants act with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the Verifi Tests and/or the creation and dissemination of supporting materials, instructions, product manuals, and/or technical information related to the Verifi Tests.

120.    Defendants specifically intend and are aware that the ordinary and customary use of the Verifi Tests by their customers and partners would infringe the '720 Patent.  For example, Defendants sell and provide the Verifi Tests, which when used in their ordinary and customary manner intended and instructed by Illumina, infringe one or more claims of the '720 Patent, including at least claim 1.  On information and belief, Defendants further provide product manuals and other instructional materials that cause their customers and partners to operate the Verifi Tests for their ordinary and customary use.  (*See, e.g.*, Ex. 9 (https://www.illumina.com/clinical/illumina_clinical_laboratory/verifi-prenatal-tests.html) ("Physicians can order this Illumina service through our network of partner labs.").)  Defendants accordingly induce third parties to use Verifi Tests in their ordinary and customary way to infringe

the '720 Patent, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the '720 Patent.

121.    In addition or in the alternative, Defendants contribute to the infringement by third parties, such as health care providers or laboratories, of one or more claims of the '720 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the Verifi Tests, knowing that those products constitute a material part of the inventions of the '720 Patent, knowing that those products are especially made or adapted to infringe the '720 Patent, and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

122.    As another example, Defendants infringe at least claim 1 of the '720 patent by using the VeriSeq Tests.  For example, use of the VeriSeq Tests requires using a method for detecting a free nucleic acid, wherein said method comprises:

    a.  isolating free nucleic acid (such as cell-free DNA) from a non-cellular fraction of a sample (such as a maternal blood sample) (*see, e.g.*, Ex. 36  at 1 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf); Ex. 71 at 1 (https://support.illumina.com/content/dam/illumina-support/documents/documentation/chemistry_documentation/veriseq-nipt-v2/veriseq-nipt-solution-v2-sample-prep-checklist-1000000076883-01.pdf) (providing 17 steps for isolating plasma from the blood sample and 27 steps for extracting cfDNA from said isolated plasma)),

    b.  wherein said sample comprises an agent that impedes cell lysis, if cells are

present, and wherein said agent is selected from the group consisting of

membrane stabilizer, cross-linker, and cell lysis inhibitor (*see, e.g.*, Ex. 37 at 2

(https://support.illumina.com/content/dam/illumina-

support/documents/documentation/chemistry_documentation/veriseq-nipt-

v2/veriseq-nipt-solution-v2-package-insert-1000000078751-02.pdf) ("**Sample**

**Collection** – 7–10 ml of maternal peripheral whole blood is collected in a Streck

cell-free DNA Blood Collection Tube (BCT), which prevents cell lysis and

genomic contamination and stabilizes whole blood."); Ex. 36 at 2

(https://support.illumina.com/content/dam/illumina-

support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-

solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf)

("**Sample Collection** – 7-10 of maternal peripheral whole blood is collected in a

Streck cell-free blood collection tube, which prevents cell lysis and genomic

contamination and stabilizes whole blood at room temperature."); Ex. 32 at 2

(https://www.streck.com/products/stabilization/cell-free-dna-bct/#resources)

(describing Streck cell-free DNA BCTs as containing a "unique preservative

[which] limits the release of genomic DNA, allowing isolation of high-quality

cell-free DNA" and "specialized chemistry" that "*limit[s] cell lysis*") (emphasis

added)),

c.  detecting the presence or absence of the free nucleic acid (*see, e.g.*, Ex. 36 at 2

(https://support.illumina.com/content/dam/illumina-

support/documents/documentation/chemistry_documentation/dx/veriseq-nipt-

solution/veriseq-nipt-solution-package-insert-ceivd-1000000001856-06.pdf)

("**Library Preparation** – The purified cfDNA fragments undergo an end repair process to convert 5' and 3' overhangs to blunt ends. . . . **Quantification** – The library product is quantified using a fluorescent die with concentration determined by comparison to a DNA standard curve")).

123.    Defendants have infringed, and continue to infringe, one or more claims of the '720 Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by using the VeriSeq Tests either themselves and/or by directing and/or controlling the performance of the claimed steps by third-party laboratories performing the VeriSeq Tests.

124.    To the extent Hamilton or another third party manufactures or sells individual components of the VeriSeq Tests, that sale is attributable to Illumina at least because Illumina has an agency or contractual relationship with said third party, and/or Illumina controls or directs the performance of said third party.  For example, Illumina controls or directs the manufacture and/or sales of the VeriSeq NIPT Microlab STAR system.  The VeriSeq NIPT Microlab STAR system is specifically configured for use with Illumina's VeriSeq NIPT Workflow Manager Software and is specifically created for use with the Illumina VeriSeq test.  (Ex. 38 (https://www.hamiltoncompany.com/automated-liquid-handling/assay-ready-workstations/veriseq-nipt-microlab-star).)  Illumina also profits from Hamilton Company's use of Illumina's intellectual property, the VeriSeq trademark.

125.    In addition or in the alternative, Defendants have induced infringement, and continue to induce infringement, of one or more claims of the '720 Patent under 35 U.S.C. § 271(b).  Defendants actively, knowingly, and intentionally induce infringement of the '720 Patent by selling or otherwise supplying the VeriSeq Tests with the knowledge and intent that third-party laboratories will use the VeriSeq Tests supplied by Defendants to infringe the '720 Patent.

48

Defendants act with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the VeriSeq Tests and/or the creation and dissemination of supporting materials, instructions, product manuals, and/or technical information related to the VeriSeq Tests.

126.    Defendants specifically intend and are aware that the ordinary and customary use of the VeriSeq Tests by their customers and partners would infringe the '720 Patent.  For example, Defendants sell and provide the VeriSeq Tests, which when used in their ordinary and customary manner intended and instructed by Illumina, infringe one or more claims of the '720 Patent, including at least claim 1.  On information and belief, Defendants further provide product manuals and other instructional materials that cause their customers and partners to operate the VeriSeq Tests for their ordinary and customary use.  Defendants accordingly induce third parties to use VeriSeq Tests in their ordinary and customary way to infringe the '720 Patent, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the '720 Patent.

127.    In addition or in the alternative, Defendants have contributed to the infringement by third parties, such as health care providers or laboratories, and continue to contribute to infringement by third parties, of one or more claims of the '720 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the VeriSeq Tests, knowing that those products constitute a material part of the inventions of the '720 Patent, knowing that those products are especially made or adapted to infringe the '720 Patent, and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

128.    As another example, Defendants infringe at least claim 1 of the '720 patent by using the TruSight Tests.  For example, use of the TruSight Tests includes using a method for detecting a free nucleic acid, wherein said method comprises:

a. isolating free nucleic acid (such as cell-free DNA) from a non-cellular fraction of a sample (such as a blood sample) (*see, e.g.*, Ex. 51 at 1 (https://support.illumina.com/content/dam/illumina-marketing/documents/products/appnotes/cfdna-quantification-tech-note-1170-2020-001.pdf) ("After blood collection, the tubes are centrifuged to separate the cfDNA-containing plasma from blood cells, which will aggregate at the bottom of the tube. The plasma can then be easily removed from the top of the tube and cfDNA extracted using a magnetic bead–based or silica membrane–based extraction kit."); Ex. 52 at 1 (https://www.illumina.com/content/dam/illumina-marketing/documents/products/technotes/trusight-umi-trusight-tumor-170-app-note-1000000050427.pdf) ("For both blood sample types, DNA was extracted with the QIAamp Circulating Nucleic Acid Kit (QIAGEN) according to manufacturer instructions, except that twice there commended plasma volume was bound to the spin column.")),

b. wherein said sample comprises an agent that impedes cell lysis, if cells are present, and wherein said agent is selected from the group consisting of membrane stabilizer, cross-linker, and cell lysis inhibitor (*see, e.g.*, Ex. 72 at 1 (Kirsten C. Verhein et. al, *Analytical validation of Illumina's TruSight Oncology 500 ctDNA assay* (abstract), 80 CANCER RES. 3114 (August 2020), https://cancerres.aacrjournals.org/content/80/16_Supplement/3114) (collecting blood samples for analysis of the TSO 500 ctDNA assay in Streck cfDNA BCTs); Ex. 52 at 1 (https://www.illumina.com/content/dam/illumina-marketing/documents/products/technotes/trusight-umi-trusight-tumor-170-app-

note-1000000050427.pdf) ("To explore the possibility of analyzing cancer-related

genes in cfDNA, targeted molecular analysis was performed using the TruSight™

Oncology UMI Reagents paired with DNA content from TruSight Tumor 170. . . .

**cfDNA-Streck**: Blood samples from healthy individuals were collected in Cell-

Free DNA BCT blood collection tubes (Streck) and kept at room temperature for

up to two days prior to processing."); Ex. 32 at 2

(https://www.streck.com/products/stabilization/cell-free-dna-bct/#resources)

(describing Streck cell-free DNA BCTs as containing a "unique preservative

[which] limits the release of genomic DNA, allowing isolation of high-quality

cell-free DNA" and "specialized chemistry" that "*limit[s] cell lysis*") (emphasis

added)),

c.   detecting the presence or absence of the free nucleic acid (Ex. 51 at 3

(https://www.illumina.com/content/dam/illumina-

marketing/documents/products/appnotes/cfdna-quantification-tech-note-1170-

2020-001.pdf) ("Accurate quantification for input into TruSight Oncology 500

ctDNA is essential to meet coverage requirements for variant calling performance

and TMB calculation."); Ex 52 (https://www.illumina.com/content/dam/illumina-

marketing/documents/products/technotes/trusight-umi-trusight-tumor-170-app-

note-1000000050427.pdf) (describing the process used for analysis of the

detection capabilities of TruSight™ Oncology UMI Reagents with TruSight

Tumor 170 DNA Content)).

129.    Defendants have infringed, and continue to infringe, one or more claims of the '720

Patent under 35 U.S.C. § 271(a), either literally and/or under the doctrine of equivalents, by using

the TruSight Tests with Streck cfDNA BCTs either themselves and/or by directing and/or controlling the performance of the claimed steps by third-party laboratories performing the TruSight Tests.  For example, Defendants and their partners use the TruSight tests with Streck cfDNA BCTs to test and promote the analytical validity of such tests.  (*See, e.g.*, Ex. 72 at 1 ("In conclusion, the TSO500 ctDNA assay enables robust detection of low frequency variants and other clinically relevant biomarkers in EDTA and Streck derived plasma samples with at least 20ng of cfDNA input."); Ex. 73 (Robin Harrington et. al., *Development and analytical validation of a 523-gene clinical assay for cell-free DNA* (abstract), 37 JOURNAL OF CLINICAL ONCOLOGY  3039 (May 20, 2019), https://ascopubs.org/doi/abs/10.1200/JCO.2019.37.15_suppl.3039) ("[W]e have completed the initial validation for the cell-free DNA (cfDNA) assay, TruSight Oncology 500 (TSO500), which interrogates the full coding region of 523 genes plus selected intronic regions for fusion detection in 23 driver genes. **Methods:** Cell-free DNA was extracted from plasma collected from Streck or EDTA blood tubes and quantitated to achieve an assay input of ≥10 ng."); Ex. 52 at 1 (https://www.illumina.com/content/dam/illumina-marketing/documents/products/technotes/trusight-umi-trusight-tumor-170-app-note-1000000050427.pdf) ("To explore the possibility of analyzing cancer-related genes in cfDNA, targeted molecular analysis was performed using the TruSight Oncology UMI Reagents paired with DNA content from TruSight Tumor 170. . . . **cfDNA-Streck**: Blood samples from healthy individuals were collected in Cell-Free DNA BCT blood collection tubes (Streck) and kept at room temperature for up to two days prior to processing.").)

130.    In addition or in the alternative Defendants have also induced infringement, and continue to induce infringement, of one or more claims of the '720 Patent under 35 U.S.C. § 271(b).  Defendants actively, knowingly, and intentionally induce infringement of the '720 Patent

52

by selling or otherwise supplying the TruSight Tests with the knowledge and intent that third-party laboratories will use the TruSight Tests supplied by Defendants to infringe the '720 Patent. Defendants act with the knowledge and intent to encourage and facilitate third-party infringement through the dissemination of the TruSight Tests and/or the creation and dissemination of supporting materials, instructions, product manuals, and/or technical information related to the TruSight Tests.

131.    Defendants specifically intend and are aware that the ordinary and customary use of the TruSight test by their customers and partners would infringe the '720 Patent.  For example, Defendants sell and provide the TruSight Tests, which when used with Streck cfDNA BCTs in their ordinary and customary manner intended and instructed by Illumina, infringe one or more claims of the '720 Patent, including at least claim 1.  On information and belief, Defendants further provide product manuals and other instructional materials that cause their customers and partners to operate the TruSight Tests for their ordinary and customary use, including use with Streck cfDNA BCTs.  Defendants accordingly induce third parties to use TruSight Tests in their ordinary and customary way to infringe the '720 Patent, knowing, or at least being willfully blind to the fact, that such use constitutes infringement of the '720 Patent.

132.    In addition or in the alternative, Defendants contribute to the infringement by third parties, such as health care providers or laboratories, of one or more claims of the '720 Patent under 35 U.S.C. § 271(c), by making, selling and/or offering for sale in the United States, and/or importing into the United States, the TruSight Tests, knowing that those products constitute a material part of the inventions of the '720 Patent, knowing that those products are especially made or adapted to infringe the '720 Patent, and knowing that those products are not staple articles of commerce suitable for substantial non-infringing use.

133.    Defendants have had knowledge of and notice of the '720 Patent and their infringement since at least the launch date of each of the infringing products.

134.    Defendants' infringement of the '720 Patent has been, and continues to be, willful and deliberate since at least the launch date of each of the infringing products.

135.    Ravgen has been and continues to be damaged by Defendants' infringement of the '720 Patent, and will suffer irreparable injury unless the infringement is enjoined by this Court.

136.    Defendants' conduct in infringing the '720 Patent renders this case exceptional within the meaning of 35 U.S.C. § 285.

## **PRAYER FOR RELIEF**

WHEREFORE, Ravgen prays for judgment as follows:

A.      That Illumina Inc. and Verinata Health Inc. have infringed each of the Patents-in-Suit;

B.      That Defendants' infringement of each of the Patents-in-Suit has been willful;

C.      That Ravgen be awarded all damages adequate to compensate it for Defendants' past infringement and any continuing or future infringement of the Patents-in-Suit up until the date such judgment is entered, including pre- and post-judgment interest, costs, and disbursements as justified under 35 U.S.C. § 284;

D.      That any award of damages be enhanced under 35 U.S.C. § 284 as result of Defendants' willful infringement;

E.      That this case by declared an exceptional case within the meaning of 35 U.S.C. § 285 and that Ravgen be awarded the attorney fees, costs, and expenses incurred in connection with this action;

F. That Ravgen be awarded either a permanent injunction, or, at least, a compulsory ongoing licensing fee; and

F. That Ravgen be awarded such other and further relief at law or equity as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff Ravgen hereby demands a trial by jury on all issues so triable.

Dated: December 3, 2020

*Of Counsel:*

John M. Desmarais
Kerri-Ann Limbeek
Jamie L. Kringstein
Brian D. Matty
Michael Ling
Deborah J. Mariottini
Email:  jdesmarais@desmaraisllp.com
Email:  klimbeek@desmaraisllp.com
Email:  jkringstein@desmaraisllp.com
Email:  bmatty@desmaraisllp.com
Email:  mling@desmaraisllp.com
Email:  dmariottini@desmaraisllp.com
DESMARAIS LLP
230 Park Avenue
New York, NY 10169
Telephone: 212-351-3400
Facsimile: 212-351-3401

Respectfully submitted,

FARNAN LLP

/s/ Michael J. Farnan
Brian E. Farnan (Bar No. 4089)
Michael J. Farnan (Bar No. 5165)
919 N. Market St., 12th Floor
Wilmington, DE 19801
Telephone: (302) 777-0300
Facsimile: (302) 777-0301
bfarnan@farnanlaw.com
mfarnan@farnanlaw.com

*Attorneys for Plaintiff Ravgen, Inc.*